1  BECK & LEE BUSINESS TRIAL LAWYERS
   JARED H. BECK (233743)
2  ELIZABETH LEE BECK (233742)
   66 West Flagler Street, Suite 1000
3  Miami, FL 33130
   Telephone:    305 789 0072
4  Facsimile:     786 664 3334
   jared@beckandlee.com
5  elizabeth@beckandlee.com
6
   Counsel for Plaintiffs and the Proposed Classes
7

**Filed**

**ADR**

MAY - 3 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                   SAN JOSE DIVISION

11                                      **CV 11-02174**

12  Free FreeHand Corp., Jabez Palmer, Eric      Case No:
    Rosenberg, Mark Oliver, Inc., and Jamie
13  Pritchett, on Behalf of Themselves and All   **PSG**
    Others Similarly Situated,
14                                               Pleading Type: Class Action
15            Plaintiffs,                        **CLASS ACTION COMPLAINT AND
16                                               DEMAND FOR JURY TRIAL**
    vs.
17
    Adobe Systems Inc.,
18
              Defendant.
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, through their undersigned attorneys, upon personal knowledge as to their own acts, and on information and belief as to all others based upon their own and their attorneys' investigation, allege as follows:

### NATURE OF THE ACTION

1.      Defendant Adobe Systems Inc. ("Adobe") has engaged in unlawful, willful acquisition and maintenance of monopoly power in the market for professional vector graphic illustration software.  In 2005, Adobe purchased Macromedia, and thus acquired FreeHand, the primary competitor to Adobe's professional graphic illustration software product, Illustrator. With its acquisition of FreeHand, Adobe acquired monopoly power in the Relevant Markets (defined herein).  Since acquiring FreeHand, Adobe has significantly raised the price of Illustrator while, at the same time, effectively removing FreeHand from the market by failing to update the program.  Adobe announced that it would stop developing FreeHand in 2007. Adobe has since published documents showing consumers how to migrate from FreeHand to Illustrator and explicitly encourages would-be purchasers of FreeHand to purchase the higher priced Illustrator software product due to the lack of support and development of FreeHand and its increasing advance to total obsolescence.  If consumers are forced to transition to Illustrator, they will lose the use of designs they have created in FreeHand.  Adobe has also refused to release the FreeHand code, which would allow FreeHand to continue to be used and developed as an open source code.

2.      This action seeks to restore competitive conditions in the vector graphic illustration software market.  On behalf of the Class Members (defined herein), Plaintiffs Free FreeHand Corp. ("Free FreeHand") and the Consumer Plaintiffs (defined herein) seek an injunction against Adobe preventing it from taking further steps to implement its unlawful scheme, including without limitation, appropriate relief to restore competitive conditions in the professional vector graphic illustration software market.  The Consumer Plaintiffs also seek damages on behalf of the Class for injury to their business or property.

## JURISDICTION, VENUE, AND COMMERCE

- 3.      Plaintiffs bring claims under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Section 2 of the Sherman Act, 15 U.S.C. § 2 and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337.

4.      Plaintiffs also bring claims under California Business and Professions Code §§ 16700 *et seq.* and 17200 *et seq.* and the Washington Consumer Protection Act, RCW 19.86.020 *et seq.*  This Court has original jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1332.  The aggregate amount in controversy for this class action exceeds $5,000,000 and members of the Class and Adobe are citizens of different states.  Alternatively, this court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue in the Northern District of California is proper under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22, and 26 because Adobe conducts business and is headquartered in this District.

6.      The conduct alleged herein has affected and is affecting a substantial volume of interstate and foreign commerce, including commerce in this District.

## PARTIES

7.      Free FreeHand is a non-profit corporation organized under the laws of the State of Washington.  Free FreeHand has over 5,500 members throughout the United States and worldwide, including in this District.

8.      Free FreeHand's members are graphic design professionals who specialize in many different areas of design, including screen printing, fine arts, animation, cartoons, catalog and newspaper design, print advertising, scientific and technical illustration, origami design, furniture design, textile design, fashion design, type/font design, and architecture.

9.      Free FreeHand's members believe FreeHand is a superior product to Illustrator.  Free FreeHand's mission is to ensure the FreeHand software's ongoing availability and viability.  Free FreeHand advocates for the ongoing maintenance and updating that is needed for the FreeHand software to work properly on the computer hardware and operating systems of today

2

and in the future. Free FreeHand was formed for the purpose of challenging the unlawful

monopolization scheme described herein, and works to accomplish its' goals through

advertising, media, internet, traditional forms of activism, and now legal action. Free FreeHand

brings this action for injunctive relief on behalf of its members and the Class for the violations of

federal antitrust laws described in this Complaint. Free FreeHand does not seek damages on

behalf of its members, nor does it seek damages or injunctive relief directly on behalf of itself.

10.    Free FreeHand's members own FreeHand software licenses for either Windows or

Macintosh. As a result of the unlawful conduct alleged herein, Free FreeHand's members have

been injured and are threatened with continued injury in their business or property.

11.    Most of Free FreeHand's members purchased software licenses for Illustrator for

either Windows or Macintosh from Adobe during the Class Period (defined herein) and have

been injured and threatened to be injured in their business or property as a result of the unlawful

conduct alleged herein.

12.    Plaintiff Jabez Palmer is an individual and resident of Seattle, Washington. Mr.

Palmer purchased a software license for Illustrator from Adobe during the Class Period (defined

herein). Mr. Palmer also owns a software license for FreeHand. Mr. Palmer has been injured in

his business or property as a result of the unlawful conduct alleged herein. Mr. Palmer is a

member of Free FreeHand.

13.    Plaintiff Eric Rosenberg is an individual and resident of Los Angeles, California.

Mr. Rosenberg purchased a software license for Illustrator from Adobe during the Class Period

(defined herein). Mr. Rosenberg also owns a software license for FreeHand. Mr. Rosenberg has

been injured in his business or property as a result of the unlawful conduct alleged herein. Mr.

Rosenberg is a member of Free FreeHand.

14.    Plaintiff Mark Oliver, Inc. ("MOI") is a California corporation with its principal

place of business in Solvang, California. MOI purchased a software license for Illustrator from

Adobe during the Class Period (defined herein). MOI also owns a software license for

FreeHand. MOI has been injured in its business or property as a result of the unlawful conduct

alleged herein. Mr. Oliver, the principal of MOI, is a member of Free FreeHand.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

15.     Plaintiff Jamie Pritchett is an individual and resident of Denton, Texas.  Mr. Pritchett purchased a software license for Illustrator from Adobe during the Class Period (defined herein).  Mr. Pritchett also owns software license for FreeHand.  Mr. Pritchett has been injured in his business or property as a result of the unlawful conduct alleged herein.  Mr. Pritchett is a member of Free FreeHand.

16.     Collectively, Jabez Palmer, Eric Rosenberg, Mark Oliver, Inc., and Jamie Pritchett, are referred to herein as the "Consumer Plaintiffs."  Free FreeHand and Consumer Plaintiffs are, at times, collectively referred to as "Plaintiffs."

17.     Defendant Adobe is a Delaware corporation with its principal place of business in San Jose, California.  Adobe maintains operations in the Americas, Europe, Middle East, Africa, and Asia.  Adobe is one of the largest software companies in the world.  It offers a line of creative, business, Web, and mobile software and services used by creative professionals, knowledge workers (e.g., attorneys, accountants, architects, educators, engineers, and stock analysts), consumers, original equipment manufacturers, developers, and enterprises.

## GRAPHIC DESIGN SOFTWARE

18.     Graphic designers create designs using a wide variety of mediums, techniques, and skills, including illustration, photography, type, composition, and page structure.  Graphic designers' services encompass work in print advertisements; logo design; packaging; websites; environments; user-interface design; animation; multi-media; games; textiles; maps; technical, scientific, and artistic illustration; catalogues; magazines; newsletters; newspapers; retail display; and book design, among others.

19.     Prior to the mid 1980s, to achieve designs, graphic designers used non-digital design tools such as film, specialized lenses, and dark room techniques for photographs; airbrushing for illustrations; and calligraphy pens for font design.  Graphic designers used rulers and measurements to manually layout pages for print.

20.     Since approximately 1990, graphic designers have used numerous interoperative software programs.  For example, graphic designers use bitmap graphic illustration software for editing photographic images and vector graphic illustration software for creating illustrations and

for font design.  Graphic designers use page layout software to achieve print layout designs.
Internet design is done using website layout programs and code editor tools, as well as bitmap
and vector graphic illustration software for web graphics, and other software used to create
content rich websites, such as audio editing and visual effects tools.

21.     Bitmap graphic illustration software programs are used primarily for editing
photographs and web graphics.  Such software allows the designer to edit images by modifying
the "pixels" that make up the form of the image. A pixel is a single point in a raster image, or the
smallest addressable screen element in a display device; it is the smallest unit of picture that can
be represented or controlled. The pixels in a bitmap image are arranged in a fine grid, and each
pixel is colored separately.  The pixels can be modified individually or as large groups.  Global
color adjustments are also possible to allow the designer to modify either the entire image or a
selected area for color balance, brightness, contrast, saturation levels, color replacement, and
other fine tuning.  Bitmap graphic illustration software programs are sometimes called "paint"
programs because the software allows the designer to, in effect, sweep across an image and alter
the characteristics of the underlying pixels.

22.     Bitmap graphic illustration software lends itself well to photographic images
because digital photographs capture hues and shades that merge imperceptibly with each pixel in
every direction.  When these colors are displayed on a computer monitor or in print, they are too
small to see individually but give the viewer the impression of continuous tone change.  Bitmap
graphic illustration software allows the user to alter pixels in a gradual way to maintain photo
realism.

23.     Bitmap images are of limited utility in graphic design.  Because bitmap images
have no structure other than the underlying sequence of pixels arranged in the grid, the only way
to enlarge a bitmap image is to make every pixel bigger.  As the image is enlarged, the image
loses the impression of a continuous smooth image, and the viewer becomes aware of the
individually colored squares that form the image.  This is called "pixelation."

24.     Professional bitmap graphic illustration software products include Adobe
Photoshop, Corel PHOTO-PAINT, and Corel PAINT.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

25.     Vector graphic illustration software is used for designing typographic elements; graphic shapes; cartoons; logos; and scientific, technical, and graphic illustrations. Vector graphic illustration software renders vector images using mathematical formulas. The graphic designer strategically plots points on the screen and then connects the points with lines that are controlled by mathematical formulas. The lines are called vectors.

26.     Features of professional vector graphic illustration software include shape coloring and manipulation, layering, filtering, blending, morphing, and alignment. Shapes may be outlined, filled, cut, rotated, skewed, distorted, duplicated, mirrored, scaled, and added to. Shapes may also be grouped, fused, cropped or used to crop others, used to mask or contain a picture, and used to make patterns. Vector image layers can be used to build up images in coherent groupings. Layers may be locked or hidden while other layers are being worked on. Numerous filters are available to create special alterations and effects with shapes or groups of shapes. Multiple blends may be used between two shapes to act as a morphing technique. Spacing and align tools allow for swift arrangement of disparate elements.

27.     Vector images can have lines with thickness and color, and shapes and objects can also be filled with a color, gradient, and texture. Each object can be moved around a page independently, which allows the designer to arrange and rearrange, and overlay or underlay objects as appropriate. Vector graphic illustration software programs are sometimes called "draw" programs because the software allows the designer to, in effect, draw images by plotting and connecting lines.

28.     By altering the position of the points and the ways in which the vectors connect them, the vectors and the resulting shapes can be reformulated. For example vector images may be scaled up many times without distortion or pixelation. When a vector image is resized, the mathematical formulas ensure that all the points and paths are repositioned so as to maintain their original relationships. Since vector art will print crisply even when resized, vector art is ideal for printing. For instance, one can print a vector logo on a small sheet of copy paper, and then enlarge the same vector logo to billboard size and keep the same crisp quality. A low-

6

1   resolution bitmap graphic would blur or pixelate excessively if it were enlarged from business

2   card size to billboard size thereby rendering the image unusable commercially.

3        29.    The following illustrations show the differences between bitmap image scaling

4   and vector image scaling.  The raster image becomes pixelated when it is reduced or enlarged.

5   The vector image maintains its crispness at all sizes:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28




Photoshop:
Raster image
*(300 dpi)*

Enlarged detail



FreeHand:
Vector image

Enlarged detail

8

30.     Vector images have additional limitations in graphic design.  Vectors cannot produce photorealistic images, since realism needs a constantly shifting description of tone and color, which is better achieved by bitmap software tools.  Vector images may be more difficult to use in web design because the files are larger and take longer to load.

31.     Professional vector graphic illustration software products include Illustrator, FreeHand, and CorelDRAW.

32.     Page layout software is used to lay type and image elements on a page.  Page layout software is commonly used to design layouts for newspapers, magazines, books, catalogues, newsletters, displays, packages, and signs.  Page layout software offers tools for control over text and image placement, leading, and kerning.

33.     Page layout software products include Adobe InDesign and QuarkXPress.

34.     Most graphic design software tools handle both vector and bitmap images, but one or the other technology generally dominates each program.  For example, vector programs are vector dominant, but they also have the ability to import bitmap images.  Similarly, bitmap illustration software have the ability to import vector images, but bitmap illustration software have primitive vector editing tools that are not sufficiently feature rich for the graphic designer to use to create or edit vector images.  Page layout software may also have limited image editing functions, but professional designers cannot use such software to create original artwork because of the very limited tool set available on page layout and software programs.

## RELEVANT MARKETS

35.     There are two relevant product markets for antitrust analysis in this action, (1) the market for professional vector graphic illustration software for Macintosh operating systems (the "Mac OS Market") and (2) the market for professional vector graphic illustration software for Windows operating systems (the "Windows OS Market").  Collectively, the Mac OS Market and the Windows OS Market are referred to herein as the "Relevant Markets."

36.     The geographic scope of both the Mac OS Market and the Windows OS Market is worldwide.  Adobe has offices throughout the world, and graphic designers outside the United States purchased Illustrator and FreeHand throughout the Class Period.  Adobe sells English,

9

1  Spanish and French versions of Illustrator and FreeHand.  Free FreeHand has members

2  throughout the world.  There are no significant impediments to the sale of imported software

3  programs in the United States.  Neither are there any significant impediments to the sale of

4  Adobe's Illustration and FreeHand products outside the United States.  In fact, Illustrator and

5  FreeHand can both be purchased and downloaded over the internet directly from Adobe's

6  website, which allows purchasers to select their location from more than 50 countries.

7       37.    In the alternative, the geographic scope of both the Mac OS Market and the

8  Windows OS Market is the entire United States.  U.S. consumers can purchase Illustrator and

9  FreeHand in stores throughout the United States, or can purchase these products online and

10  download the programs directly from Adobe's website, or can have the programs shipped

11  anywhere within the United States.

12       38.    The Mac OS Market is distinct from the Windows OS Market, as demonstrated by

13  the fact that Adobe sells separate versions of both Illustrator and FreeHand for the Windows and

14  Macintosh platforms.  Similarly, CorelDRAW, a professional vector graphic illustration software

15  product, runs on the Windows operating system but not on the Macintosh operating system; thus,

16  CorelDRAW competes in the Windows OS Market but not in the Mac OS Market.  Absent the

17  purchase of additional costly software, products created for the Windows operating system

18  cannot run on Macintosh operating systems.  Products created for the Macintosh operating

19  system cannot run on non-Apple IBM – PC compatible computers because, among other reasons,

20  the Macintosh software licensing agreement permits the use of the Macintosh operating system

21  on only Apple-branded systems.

22       39.    Vector graphic illustration software programs are used to create vector images on

23  computers using vector graphic technology, which employs geometric primitives, such as points,

24  lines, curves, and polygon shapes, all based on mathematical equations, to represent images in

25  computer graphics.

26       40.    Excluded from the Relevant Markets are "hobbyist" level vector graphic

27  illustration programs, such as Serif DrawPlus, Xara X, Draw well, Photoline, Inkscape,

28  Lineform, Sketsa SVG editor, Zeusdraw, Easy draw, and Intaglio.  Hobbyist level programs are

10

1    not substitutes for professional grade products because they: (1) do not output "CMYK" images,

2    which are necessary for commercial printing; (2) do not output native files accepted by

3    commercial printers; (3) are not interoperable with other software that professional designers

4    use; (4) are less efficient because they do not allow for multiple designs within one project

5    (called "multipaging") or offer the full suite of features professional level software that design

6    professionals require; (5) do not offer technical support; and (6) offer only limited file sharing

7    capabilities.

8        41.    Hobbyist level software is not a substitute for professional level software because

9    hobbyist software cannot produce CMYK images. CMYK refers to the four inks used in

10    commercial color printing: cyan-magenta-yellow-key (black). Hobbyist level software produces

11    images in "RGB," that is, red-green-blue. Thus, RGB images are based on three colors that are

12    different than the four colors of commercial printer ink. Considering that commercial print jobs

13    can easily cost thousands of dollars, commercial printers require CMYK images or "calibrated

14    CMYK" images because such images accurately depict the colors of the ink that the commercial

15    printer will combine to form the color image.

16        42.    Hobbyist level software is not a substitute for professional level software because

17    hobbyist level software programs' native file outputs are not accepted by commercial printers.

18    Commercial printers have their own software, which needs to be compatible with the files the

19    designer sends to be printed. Commercial printers generally accept only Adobe, FreeHand, and,

20    to a lesser extent, Corel files. Designers who want to print commercially cannot use file types

21    that commercial printers cannot accept.

22        43.    Hobbyist level file outputs are not interoperable with the many other software

23    programs that designers use to create design products. For example, a designer can create a

24    vector image in Illustrator or FreeHand and then import it into a bitmap program and finally to a

25    page layout program. Hobbyist level software does not have this capability.

26        44.    Hobbyist level software is not a substitute for professional level software because

27    such programs are not as efficient and do not offer as many features. For example, Illustrator

28    and FreeHand both offer multipaging, which allows designers to work more efficiently by

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1    allowing them to keep multiple designs within one project.  This function eliminates the need to

2    open separate programs and files.  Further, professional vector graphic illustration software

3    products have more extensive feature sets than hobbyist software.  Hobbyist level programs are

4    less mature than professional level programs, which means that more features are works in

5    progress, and much fewer development hours have been spent on the programs, so there are

6    more bugs and the operations are less streamlined.  Further, companies offering hobbyist level

7    software do not offer technical support, whereas professional grade products have devoted

8    technical support.

9         45.    Hobbyist level software programs lack the file sharing capabilities of professional

10   vector graphic illustration programs.  Professionals need their software to handle both "EPS" and

11   "PDF" files in order to share files with printers and design agencies, and this functionality is only

12   included in professional level software.

13        46.    Further, hobbyist level software programs cost far less than professional products,

14   indicating they are not substitutes for professional level products.  Hobbyist level software costs

15   no more than $100 (most programs cost between $50 and $60), whereas Adobe sells Illustrator

16   for $599 and FreeHand for $399.

17        47.    Also excluded from the Relevant Markets are computer-aided design ("CAD")

18   programs, such as Acdsee Canvas.  These programs are used for creating technical drawings

19   where accuracy is needed.  For example, CAD programs are used to draw motor parts and

20   engineering and architectural drawings.  Such drawings may be sent directly to a machinist for

21   production.  CAD programs are not substitutes for professional vector graphic illustration

22   software as it is very difficult for designers to create original artwork using CAD programs

23   because creating artwork is not the intended purpose of such programs.

24        48.    Also excluded from the Relevant Markets is bitmap graphic illustration software.

25   Bitmap graphic illustration software is not a substitute for vector graphic illustration software, as

26   bitmap graphic illustration software falls far short of performing all the functions of vector

27   graphic illustration software that professional graphic designers require.  Bitmap software

28   painting techniques cannot be used to draw images.  Further, unlike images created with vector

graphics, which can be scaled indefinitely without degrading quality, bitmap images become increasingly pixilated as the image is enlarged.

49.     Also excluded from the Relevant Markets is page layout software. Professional graphic designers cannot substitute page layout programs for dedicated vector graphic illustration software programs, as they fall far short of performing all the functions of vector graphic illustration software that professional graphic designers require.

50.     Illustrator and FreeHand are the only products competing in the Mac OS Market because these products are the only vector illustration software products available for Macintosh operating systems that offer features and performance characteristics enabling graphic professionals to efficiently and reliably create and print high quality illustrations.

51.     Illustrator, FreeHand, and CorelDRAW are the only products competing in the Windows OS Market because these are the only vector illustration software products available for Windows operating systems that offer features and performance characteristics enabling graphic professionals to efficiently and reliably create and print high quality illustrations.

52.     Graphic designer consumers view FreeHand and Illustrator as the only competitors in the Mac OS Market. Further, when discussing Illustrator, trade press and stock analysts reports list its only competitors as FreeHand and CorelDRAW.

53.     There are currently no close substitutes for professional graphic illustration software, and no other product significantly constrains the price of this software.

54.     There are not likely to be any reasonably interchangeable products in the Relevant Markets in the near future that professional designers can substitute for the same purpose because developing a professional vector illustration software is difficult, time consuming, and unlikely. Marketing a technically comparable or even an improved software program would be difficult, time consuming, and unlikely because of network externalities associated with the current competitors' extensive installed user bases. Further, any new software product would have to simultaneously overcome a second network effect in the commercial printer software market. For the same reasons, repositioning other programs to compete in the Relevant Market would also be difficult, time consuming, and unlikely. Thus, no potential substitutes constrain

1   pricing in the vector graphic illustration software market. In addition, switching to a new vector

2   illustration software product would impose significant costs on consumers, both in terms of time

3   and money. This acts as a barrier to entry because firms considering entering the professional

4   vector illustration software market know that it will be difficult to convince consumers to invest

5   the time and money necessary to purchase and learn how to use the new program.

6                    **ADOBE'S MONOPOLY POWER IN THE RELEVANT MARKETS**

7          55.     Adobe possesses monopoly power in the Macintosh Submarket. Adobe owns the

8   only two products that compete in the Mac OS Market, Illustrator and FreeHand, and thus

9   possesses 100% market share of the Macintosh Submarket.

10          56.     Adobe possesses monopoly power in the Windows OS Market, which is

11   comprised of FreeHand, Illustrator and CorelDRAW. Adobe owns two of the three products that

12   compete in the Windows OS Market. Its ownership of these two products, FreeHand and

13   Illustrator, gives Adobe approximately 80% market share of the Windows OS Market.

14          57.     Adobe's monopoly position in both Relevant Markets is protected by high

15   barriers to entry. Entry into the Relevant Markets has not been timely and will not be timely,

16   likely, or sufficient in magnitude, character, and scope to deter or counteract the anticompetitive

17   effects of Adobe's conduct. Developing a competing professional grade vector graphic

18   illustration software program would likewise be difficult and time consuming. Marketing a

19   technically comparable or even an improved illustration program would be expensive, difficult

20   and time consuming because of the network externalities associated with Illustrator's and

21   FreeHand's extensive installed user bases and adoption as the standard file types accepted by

22   commercial printers. In addition, entrants to the market would face strong consumer resistance

23   to transitioning to a new product because doing so would require consumers to purchase the new

24   product and then invest a significant amount of time learning how to use the new product.

25          58.     Entry into the professional grade vector graphic illustration software market has

26   been limited. Entrants have not achieved commercial success on any significant scale.

27          59.     Accordingly, Adobe has the power to extract supracompetitive prices in the

28   Relevant Markets.

                                                    14

**ADOBE'S ACQUISITION OF FREEHAND**

60.     In 1994, Adobe acquired Aldus, a software company that developed groundbreaking desktop publishing software and owned a number of other software used in the graphic design field, including FreeHand.  Aldus marketed and sold FreeHand pursuant to a software license with Altsys, the company that developed and first published the FreeHand software under the name Virtuoso before licensing it to Aldus.

61.     The Federal Trade Commission ("FTC") challenged Adobe's acquisition of Aldus, charging that the effect of the acquisition may be substantially to lessen competition, or to tend to create a monopoly in the market for "professional illustration software for use on Apple Macintosh and Power Macintosh computers." *In the Matter of Adobe Systems Inc.*, 188 F.T.C. 940, 942 (1994).

62.     The FTC found the Illustrator and FreeHand products to be differentiated from other illustration software based on features and customer preferences.  The FTC limited its market definition to ***professional*** illustration software running on Apple computers, distinguishing programs that offer "features and performance characteristics enabling graphic professionals efficiently and reliable to create and print high-quality illustrations." *Id.*  Further, the FTC found that even assuming a broader illustration software market, "a significant share of sales in the broader markets is accounted for by customers who regard Illustrator and FreeHand as their first and second choices." *Id.*

63.     The FTC also limited its market definition to those software programs that run on Apple Macintosh and Power Macintosh computers and excluded IBM-compatible computers with the Windows operating system.  Even if computers running the Windows operating system were included, the FTC concluded that Adobe's acquisition of the FreeHand software would substantially lessen competition, or to tend to create a monopoly in the market. *Id.*

64.     The FTC found that Adobe and Aldus had "competed vigorously against each other with respect to pricing and development of new versions of Illustrator and FreeHand." *Id.* at 943.  Accordingly, the FTC found that Adobe's proposed acquisition of Aldus, if

15

consummated, may substantially lessen competition or tend to create a monopoly in the relevant markets, in the following ways, among others:

> a. It will increase the already high concentration in the relevant markets;
> b. It will eliminate Aldus as a substantial independent competitive force in the relevant markets;
> c. It will eliminate actual, direct and substantial competition between Adobe and Aldus;
> d. It will eliminate competition between the two closest substitutes, Illustrator and FreeHand, among differentiated products in the relevant markets;
> e. It will allow the merged firm unilaterally to exercise market power;
> f. It will allow the merged firm to raise prices, either directly or through reduced discounting, promotion, or services, on either Illustrator or FreeHand or on both products;
> g. It will allow the merged firm to reduce innovation by delaying or reducing product development; and
> h. It will increase the likelihood of coordinated interaction.

*Id.*

65. Adobe, Aldus, and the FTC signed a consent order, dated October 18, 1994, divesting Adobe of FreeHand. The purpose of the divestiture was "to ensure the continuation of FreeHand as an ongoing viable Professional Illustration Software program, to maintain FreeHand as an independent competitor in the Professional Illustration Software business, and to remedy the lessening of competition resulting from the acquisition as alleged in the Commission's complaint." *Id.* at 946.

66. In addition to requiring Adobe to divest FreeHand, the FTC prohibited Adobe from acquiring FreeHand or any other professional illustration software for a period of 10 years. *See id.* at 947.

67. Following the FTC consent order, FreeHand reverted to Altsys. In January 1995, Macromedia acquired Altsys.

68. In 2005, at the conclusion of the 10 year non-acquisition period mandated by the FTC consent order, Adobe acquired FreeHand by purchasing Macromedia.

**COMPETITION BETWEEN ILLUSTRATOR AND FREEHAND**

69. In the late 1980s and through Adobe's acquisition of FreeHand, there was vigorous innovation in professional vector illustration software and vigorous competition

16

between Illustrator and FreeHand.  FreeHand was a serial innovator, consistently releasing new versions with first to market features:

- 1988:  FreeHand 2 introduced auto trace, edible blends, Tiff import, custom fills, and tiled fills features.

- 1991:  FreeHand 3 was the first vector illustration software program to allow multiple pages in any mix of sizes and orientation.

- 1994:  FreeHand 4 allowed 24 letter size pages tiled on the screen and featured wrapping tabs to wrap paragraphs within columns and tables as well as auto fit text boxes.

- 1995:  FreeHand 5 introduced new features including a knife tool that closed the paths it cut, the ability cut and paste attributes from one object to another, a perspective tool to create 2-D objects that appeared three dimensional, a zoom tool of up to 1,638,400%, automatic trapping, an eye dropper tool that picks up colors from imported images, and graduated and radial fills with up to 64 colors.

- 1996:  FreeHand 7 introduced new features including drag and drop in both direction between FreeHand and Photoshop, the ability to blend between colors and gradients, and a chart tool.

- 1998:  FreeHand 8 new features including transparency, a graphic hose to spray symbols, a reshape tool to push and pull paths, and a magnifying lens to zoomed copy of any area.

- 2000:  FreeHand 9 had the ability to add hyperlinks to objects and export to PDF, HTML, and Flash as well as to Photoshop with layers intact, and also included a lasso tool to select freeform areas, a magic wand tool for selecting objects, an envelope tool to distort graphics and text, perspective grids that reshape objects as the grid is edited, and the ability to convert a document to grayscale.

- 2001:  FreeHand 10 had a symbol library, master pages, and the ability to print an area of a page.

- 2003:  FreeHand MX introduced an extrude tool for adding 3-D effects to objects, the ability to edit gradients directly within an object, and an eraser tool to erase portions of objects.

70.    In 2005, Adobe acquired and then discontinued FreeHand in order to end competition in the Relevant Markets.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

71.     Since its acquisition of FreeHand, Adobe has continually and significantly increased the price of Illustrator.  In 2004, prior to the acquisition, the price for Adobe Illustrator (when purchased as a standalone product, as opposed to as part of a software suite) was $399.  In 2005, Adobe raised the price of Illustrator 25% to $499.  In 2008, Adobe released a new version of Illustrator and again raised the price of Illustrator 20% over 2005 prices, to $599.

72.     In 2005, simultaneous with its Illustrator price increase, upon purchasing FreeHand, Adobe stopped its development.

73.     During its ownership of FreeHand, Adobe has not delivered any new features for the software.  In 2007, Adobe publicly announced that it would stop developing FreeHand. Adobe has effectively acknowledged its intent to cripple innovation in the Relevant Markets. For example, the 2005 version of FreeHand is available for purchase on Adobe's website; however, Adobe explicitly encourages consumers to purchase Illustrator, making it clear that Adobe will not update FreeHand, and that failure to do so has crippled FreeHand's functionality, despite Adobe's acknowledgement of FreeHands' "loyal following":

**Adobe and the Future of FreeHand**

No updates to FreeHand have been made for over four years, and Adobe has no plans to initiate development to add new features or to support Intel-based Macs and Windows Vista.
**Note: Freehand does not work with Mac OS X 10.6 or higher.**

To support customer workflows, we will continue to sell FreeHand and offer technical and customer support in accordance with our policies.

While we recognize FreeHand has a loyal customer base, we encourage users to migrate to the new Adobe Illustrator CS5 software which supports both PowerPC and Intel-based Macs and Microsoft Windows XP and Windows Vista..

74.     Thus, Adobe has crippled innovation in the Relevant Markets.

75.     Post-acquisition, Adobe has simply been incorporating existing FreeHand features into Illustrator, instead of innovating and developing features not already developed for FreeHand.  These features include, among others, perspective tool, paste/draw inside, blob brush, and multiple pages.

18

## ADOBE OBTAINED AND PROTECTS ITS MONOPOLY POWER THROUGH ANTICOMPETITIVE CONDUCT

76.     Adobe's monopoly power did not result from superior business acumen or simple good fortune.  Rather, Adobe willfully acquired, maintains, and unlawfully exercises its monopoly position in the Relevant Submarkets through predatory, exclusionary, and anticompetitive conduct.

77.     Adobe's purchase and subsequent continuing failure to update FreeHand was an improper and exclusionary way to gain and maintain monopoly power.  Adobe did not achieve monopoly by competing legitimately in the Relevant Market, for example by developing a superior product or by offering Illustrator at a lower price.  Rather, Adobe willfully acquired and maintained its monopoly power with improper conduct, by crippling FreeHand, Illustrator's primary competitor.  In acquiring and failing to update and support FreeHand, and providing materials to help consumers transition from FreeHand to Illustrator, Adobe has engaged in willful anticompetitive behavior instead of lawfully competing in the Relevant Submarkets on the merits of Adobe's products.

78.     Throughout the Class Period, Adobe has "bundled" Illustrator, selling it as part of its Illustrator Creative Suite ("CS") product along with other Adobe products.  In different versions of Adobe's CS product, Illustrator was bundled with various related Adobe graphics programs, including Bridge (organizational program), InDesign (desktop publishing), Photoshop (raster graphics editor), Version Cue (file tracking), Acrobat Professional (used to manage and create PDF documents), Dreamweaver (web development), and GoLive (web development).  Adobe's bundling of Illustrator constitutes a significant entry barrier by limiting the ability of potential rival professional software manufacturers to enter the market without a full array of graphics software.

79.     Adobe's course of conduct warrants antitrust liability even if Adobe's acts would be considered lawful if viewed individually.

80.     There is no legitimate business justification for Adobe's actions, including its acquisition of FreeHand through its purchase of Macromedia, and its subsequent failure to support FreeHand.

19

## ADOBE REFUSED TO MAKE FREEHAND SOURCE CODE PUBLIC SO
## THAT FREEHAND CAN BECOME AN OPEN-SOURCE PROGRAM

81. Generally, commercial software products use a "Cathedral" approach, in which the CEO is seen as a kind of "pope" who decides on the vision and directs paid managers and workers to carry it out.

82. In contrast, open-source software is developed using the "Bazaar" approach, in which there is no dictator and instead people call out requests for new features, point out bugs, and contribute new code and bug fixes. In other words, software is produced by the loosely coordinated and voluntary efforts of users and programmers. The Linux operating system is a good example of software produced by a large numbers of volunteers.

83. Currently, there are open source alternatives to nearly every significant piece of commercial software. For example, OpenOffice.org is a complete alternative to Microsoft's office suite and has been downloaded almost 100,000,000 times. Estimates are that about 60% of servers and 4% of user desktops run the Linux operating system, and more than half of all servers use the open-source Apache web-server software in preference to a commercial alternative. SourceForge.com is a site that provides collaborative web-tools that facilitate and coordinate open source software projects of all kinds. SourceForge claims participation by some 2.7 million developers involved in over 260,000 projects with more than 2,000,000 items being downloaded by consumers each day.

84. After fighting a losing battle with Internet Explorer in the late 1990s, NetScape released their source code in January 1998 and the result was the highly successful open-source Mozilla project.

85. Contributors to open-source software are unpaid volunteers. Research suggests that these volunteers are motivated by (1) a desire to consume the public good produced as a result of these contributions, (2) an expectation of reaping benefits from being noticed as a contributor, and (3) an enjoyment of the act of contributing.

86. Voluntary contributions to open-source codes are economically significant. An estimate for 2001 by the *Independent Sector* suggests that 89 percent of US households make

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1   contributions and that the average annual contribution for contributors is $1,620.  In addition,

2   83.9 million American adults volunteer the equivalent of over 9 million full-time employees at a

3   value of $239 billion.

4       87.    Releasing popular software that a company has abandoned or otherwise does not

5   plan to monetize (NetScape, and StarOffice, for example) in open-source format seems like a

6   win-win.  The company gets good will from both the user and developer communities, and the

7   communities get access to interesting and useful code.

8       88.    Both FreeHand and Illustrator are examples of "Cathedral" commercial programs.

9       89.    Free FreeHand's members have repeatedly requested that Adobe make the source

10  code of FreeHand public, so that FreeHand can be updated and continue to evolve as an open-

11  source software.

12      90.    Despite the fact that Adobe has no plans to update FreeHand, it has refused to

13  make its source code public.

14                          **ANTICOMPETITIVE EFFECTS**

15      91.    Adobe's monopolistic conduct has produced significant anticompetitive effects.

16  Instead of competing in the Relevant Market on the merits of its products through price and

17  feature innovation, Adobe attacked FreeHand, Illustrator's primary rival.  Adobe's monopolistic

18  conduct has harmed competition in the Relevant Submarkets and thereby harmed Plaintiffs and

19  the Class Members.

20      92.    The anticompetitive effects of Adobe's conduct far outweigh any conceivable

21  procompetitive benefits or justifications.

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

### HARM SUFFERED BY PLAINTIFFS

93.    Plaintiffs have been injured in their business or property by Adobe's monopolization of the relevant market.  None of the harms Plaintiffs' suffered, detailed herein, are conditional on any future acts or decisions of the parties.  All of the harms are real and will continue to occur if equitable relief is not ordered by this Court.

**_Free FreeHand Members_**

94.    As noted above, Free FreeHand was formed for the purpose of challenging Adobe's unlawful scheme as alleged herein.

95.    Free FreeHand's members include graphic designers that desire to continue to use FreeHand software.

96.    Members of Free FreeHand will be harmed by the actions detailed in this Complaint because Adobe's failure to update FreeHand will cause it to become incompatible with future versions of computer operating system software.  Not only are Free FreeHand members threatened by the imminent obsolescence of the software, but they are also threatened by the loss of their designs because images created in FreeHand are not useable when imported into Illustrator.

**_Consumer Plaintiffs_**

97.    Consumer Plaintiffs who purchased Illustrator licenses are harmed through the actions detailed in this Complaint by the unlawful monopoly prices that Adobe exacts for purchases of Illustrator and FreeHand.

98.    Consumer Plaintiffs who own FreeHand software licenses are harmed by the actions detailed in this Complaint because Adobe's failure to update FreeHand will cause it to become incompatible with future versions of computer operating system software.  Not only are Free FreeHand members threatened by the imminent obsolescence of the software, but they are also threatened by the loss of their designs because images created in FreeHand are not useable when imported into Illustrator.

# CLASS ACTION ALLEGATIONS

99.     Plaintiffs seek to represent four classes (collectively the "Class Members") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

 a. The first class, "Mac Damages Class," seeks damages only for violations of 15 U.S.C. § 2, Cal. Bus. & Prof. Code § 16700 *et seq.* and RCW 19.86.020 *et seq.* and is defined as:

  All persons or entities that purchased FreeHand or Illustrator for a Macintosh operating system from at any time since Adobe's purchase of Macromedia in 2005 (the "Class Period"). Excluded from the Mac Damages Class are Defendants and their subsidiaries, parents, or affiliates, and government entities.

 b. The second class, "Windows Damages Class," seeks damages only for violations of 15 U.S.C. § 2, Cal. Bus. & Prof. Code § 16700 *et seq.* and RCW 19.86.020 *et seq.* and is defined as:

  All persons or entities that purchased FreeHand or Illustrator for a Windows operating system from at any time since Adobe's purchase of Macromedia in 2005 (the "Class Period"). Excluded from the Windows Damages Class are Defendants and their subsidiaries, parents, or affiliates, and government entities.

 c. The third class, "Mac Injunctive Class," seeks declaratory and injunctive relief only for violations of 15 U.S.C. § 2, Cal. Bus. & Prof. Code § 16700 *et seq.* and RCW 19.86.020 *et seq.* and is defined as:

  All persons or entities that currently use professional vector graphic illustration software on a Macintosh operating system, in addition to Free FreeHand. Excluded from the Mac Injunctive Class are Defendants and their subsidiaries, parents, or affiliates, and government entities.

 d. The fourth class, "Windows Injunctive Class," seeks declaratory and injunctive relief only for violations of 15 U.S.C. § 2, Cal. Bus. & Prof. Code § 16700 *et seq.* and RCW 19.86.020 *et seq.* and is defined as:

  All persons or entities that currently use professional vector graphic illustration software on a Windows operating system, in addition to Free FreeHand. Excluded from the Windows Injunctive Class are Defendants and their subsidiaries, parents, or affiliates, and government entities.

100.     The Mac Damages Class and Windows Damages Class are collectively referred to as the "Damages Classes." The Mac Injunctive Class and Windows Injunctive Class are collectively referred to as the "Injunctive Classes."

101.     Consumer Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of themselves and the Damages Classes. Consumer Plaintiffs are

1   members of the Damages Classes; their claims are typical of the claims of the other Damages

2   Class members, and Plaintiffs will fairly and adequately protect the interests of Damages

3   Classes.  Plaintiffs and the members of the Class have all sustained damage in that during the

4   Class Period they purchased Illustrator or FreeHand directly from Defendant Adobe at artificially

5   maintained, non-competitive prices, established by the actions of Adobe in connection with the

6   anticompetitive behavior alleged herein.  Plaintiffs are represented by counsel who are

7   competent and experienced in the prosecution of class-action antitrust litigation.  Plaintiffs'

8   interests are coincident with, and not antagonistic to, those of the other members of the Damages

9   Classes.

10      102.    Consumer Plaintiffs and Free FreeHand bring this action under Federal Rules of

11  Civil Procedure 23(a) and (b)(2), on behalf of themselves and the Injunctive Classes.  These

12  Plaintiffs are members of Injunctive Classes; their claims are typical of the claims of the other

13  Injunctive Class members, and Plaintiffs will fairly and adequately protect the interests of

14  Injunctive Classes.  Plaintiffs are represented by counsel who are competent and experienced in

15  the prosecution of class-action antitrust litigation.  Plaintiffs' interests are coincident with, and

16  not antagonistic to, those of the other members of Injunctive Classes.

17      103.    The Classes are individually so numerous that joinder of all members is

18  impracticable. While the exact number of members of the Classes is unknown to Plaintiffs at this

19  time, based on the nature of the trade and commerce involved, Plaintiffs reasonably believe that

20  there are thousands of members in the Classes and that their identities can be learned from

21  records in Defendants possession, custody or control.  Class Members are geographically

22  dispersed throughout the United States and the entire world.

23      104.    Common questions of law and fact exist as to all Class Members and predominate

24  over any questions affecting solely individual Class Members.

25      105.    The questions of law and fact common to the Mac Damages Class include, but are

26  not limited to:

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

a.  whether the market for professional vector graphic illustration software operating on a Macintosh operating system is the relevant product market;

b.  whether the relevant geographic market is worldwide, or in the alternative is limited to the United States;

c.  whether Adobe possesses monopoly power in the Relevant Market;

d.  whether, through the conduct alleged herein, Adobe willfully acquired, maintained and enhanced its monopoly power in the professional vector illustration graphic software market.

e.  whether and to what extent, Defendant's conduct caused Class members to pay supra-competitive prices and, thereby, suffer antitrust injuries; and

f.  whether Plaintiffs and Mac Damages Class members are entitled to any damages and, if so, the appropriate Class-wide measure of damages.

106.    The questions of law and fact common to the Windows Damages Class include, but are not limited to:

a.  whether the market for professional vector graphic illustration software operating on a Windows Operating System is the relevant product market;

b.  whether the relevant geographic market is worldwide, or in the alternative is limited to the United States;

c.  whether Adobe possesses monopoly power in the Relevant Market;

d.  whether, through the conduct alleged herein, Adobe willfully acquired, maintained and enhanced its monopoly power in the professional vector illustration graphic software market.

e.  whether and to what extent, Defendant's conduct caused Class members to pay supra-competitive prices and, thereby, suffer antitrust injuries; and

f.  whether Plaintiffs and Windows Damages Class members are entitled to any damages and, if so, the appropriate Class-wide measure of damages.

107.    The questions of law and fact common to the Mac Injunctive Class include, but are not limited to:

25

a.  whether the market for professional vector graphic illustration software operating on a Macintosh operating system is the relevant product market;

b.  whether the relevant geographic market is worldwide, or in the alternative is limited to the United States;

c.  whether Adobe possesses monopoly power in the Relevant Market;

d.  whether, and to what extent, Defendant's conduct caused members of the Mac Injunctive Class to suffer irreparable harm because of Adobe's failure to update FreeHand or make public FreeHand's sourcecode so that FreeHand can become an open source software;

e.  whether, through the conduct alleged herein, Adobe willfully acquired, maintained and enhanced its monopoly power in the professional vector illustration graphic software market.

108.  The questions of law and fact common to the Windows Injunctive Class include, but are not limited to:

a.  whether the market for professional vector graphic illustration software operating on a Windows operating system is the relevant product market;

b.  whether the relevant geographic market is worldwide, or in the alternative is limited to the United States;

c.  whether Adobe possesses monopoly power in the Relevant Market;

d.  whether, and to what extent, Defendant's conduct caused members of the Windows Injunctive Class to suffer irreparable harm because of Adobe's failure to update FreeHand or make public FreeHand's sourcecode so that FreeHand can become an open source software;

e.  whether, through the conduct alleged herein, Adobe willfully acquired, maintained and enhanced its monopoly power in the professional vector illustration graphic software market.

109.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all the Class Members is impracticable. The prosecution of separate actions by individual Class Members would impose heavy burdens upon the courts and Defendant Adobe, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to all of the Class Members. A class action would

26

1  achieve substantial economies of time, effort and expense, and would assure uniformity of

2  decision as to persons similarly situated without sacrificing procedural fairness.  There will be no

3  material difficulty in the management of this action as a class action on behalf of the Class

4  Members.

## FIRST CLAIM FOR RELIEF

*Violation of 15 U.S.C. § 2*

110.   Plaintiffs repeat and incorporate by reference the allegations set forth above as if fully set forth herein.

111.   Adobe possesses monopoly power in the vector graphic illustration software market.  By such acts, practices, and conduct, Adobe has unlawfully monopolized the vector graphic illustration software market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

112.   By reason of Adobe's violations of Section 2 of the Sherman Act, Consumer Plaintiffs have been injured in their business or property, including through the payment of supracompetitive prices.

113.   Consumer Plaintiffs and members of Free FreeHand have suffered irreparable injury by reason of the acts, practices, and conduct of Adobe alleged above, and will continue to suffer such injury until and unless the Court enjoins such acts, practices, and conduct.

## SECOND CLAIM FOR RELIEF

*Violation of California Business and Professions Code §16700 et seq.*

114.   Plaintiffs repeat and incorporate by reference the allegations set forth above as if fully set forth herein.

115.   Adobe possesses monopoly power in the Relevant Markets.  By its acts, practices, and conduct, Adobe has unlawfully engaged in a continuing unlawful trust in restraint of trade and commerce described above in violation of California Business and Professions Code §16720.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

116.    By reason of Adobe's violation of California Business and Professions Code §16720, Plaintiffs have been injured in their business or property, including through payment of supracompetitive prices.

117.    Consumer Plaintiffs and members of Free FreeHand have suffered irreparable injury by reason of the acts, practices, and conduct of Adobe alleged above, and will continue to suffer such injury until and unless the Court enjoins such acts, practices, and conduct.

## THIRD CLAIM FOR RELIEF

*Violation of California Business and Professions Code § 17200 et seq.*

118.    Plaintiffs repeat and incorporate by reference the allegations set forth above as if fully set forth herein.

119.    Adobe took the actions described above for the twin purposes of injuring competition and harming Plaintiffs and the Classes.  In doing so, Adobe committed unlawful, unfair, and fraudulent business acts and practices, thus violating the provisions of the Unfair Competition Law, California Business and Professions Code § 17200 *et seq.*

120.    As a legal and proximate result of Adobe's wrongful course of conduct, Plaintiffs and the Classes are entitled to decrees enjoining Adobe from all further unfair competition, ordering it to cease and desist therefrom, and enjoining it to disgorge and/or make restitution of all ill-gotten gains received to Plaintiffs and the Classes, all pursuant to the provisions of California Business and Professions Code § 17203.

## FOURTH CLAIM FOR RELIEF

*Violation of the Washington Consumer Protection Act, RCW 19.86.020 et seq.*

121.    Plaintiffs repeat and incorporate by reference the allegations set forth above as if fully set forth herein.

122.    The Washington Consumer Protection Act ("CPA"), RCW 19.86.020 *et seq.*, provides consumers with a procedure for redressing violations of applicable law.  RCW 19.86.090, in conjunction with RCW 19.86.020, provides a private right of action to any person injured by "unfair or deceptive acts or practices."

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

123. Defendants' unlawful monopolization of the professional vector software market and failure to make FreeHand sourcecode public, open-source software violated the CPA because it: (i) was an unfair or deceptive act or practice; (ii) was committed in the course of Defendants' business; (iii) was committed with a public interest impact (Defendants' actions affected hundreds of thousands of consumers); and (iv) has caused injury to property of Plaintiffs and Class Members.

124. By reason of Adobe's violation of California Business and Professions Code §16720, Plaintiffs have been injured in their business or property, including through payment of supracompetitive prices.

125. Consumer Plaintiffs and members of Free FreeHand have suffered irreparable injury by reason of the acts, practices, and conduct of Adobe alleged above, and will continue to suffer such injury until and unless the Court enjoins such acts, practices, and conduct.

<strong>FIFTH CLAIM FOR RELIEF</strong>

*Violation of the Washington Consumer Protection Act, RCW 19.86.040 et seq.*

126. Plaintiffs repeat and incorporate by reference the allegations set forth above as if fully set forth herein.

127. Adobe possesses monopoly power in the vector graphic illustration software market. By such acts, practices, and conduct, Adobe has unlawfully monopolized the vector graphic illustration software market, in violation of RCW 19.86.40.

128. By reason of Adobe's violations of RCW 19.86.040, Consumer Plaintiffs have been injured in their business or property, including through the payment of supracompetitive prices.

129. Consumer Plaintiffs and members of Free FreeHand have suffered irreparable injury by reason of the acts, practices, and conduct of Adobe alleged above, and will continue to suffer such injury until and unless the Court enjoins such acts, practices, and conduct.

<strong>REQUEST FOR RELIEF</strong>

WHEREFORE, Plaintiffs request that the Court:

130. Certify the Classes defined herein and appoint the undersigned as Class Counsel;

29

1    131.    Adjudge and decree that Adobe has monopolized interstate trade and commerce

2  in the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

3    132.    Adjudge and decree that Adobe has violated California Business and Professions

4  Code §§ 16700 *et seq.* and 17200 *et seq.*;

5    133.    Adjudge and decree that Adobe has violated Washington Consumer Protection

6  Act, RCW 19.86.20 *et seq.* and 19.86.040 *et seq.*;

7    134.    Enter judgment against Adobe for treble the amount of Plaintiffs' damages proven

8  at trial in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15;

9    135.    Enjoin Adobe's continuing violations of law by requiring divestiture of the

10  FreeHand software by Adobe in accordance with Section 16 of the Clayton Act, 15 U.S.C. § 26;

11    136.    Award Plaintiffs and the Class Members their costs and expenses of litigation,

12  including attorneys' fees and expert witness fees; and

13    137.    Order other relief as the Court may consider necessary or appropriate to restore

14  competitive conditions in the relevant market affected by Adobe's unlawful conduct.

### DEMAND FOR JURY TRIAL

16    Plaintiffs hereby demand trial by jury in this action on all issues so triable.

17  DATED: May 2, 2011

Respectfully submitted,

Jared H. Beck
BECK & LEE BUSINESS TRIAL LAWYERS
JARED H. BECK
ELIZABETH LEE BECK
66 West Flagler Street, Suite 1000
Miami, FL 33130
Telephone:    305 789 0072
Facsimile:    786 664 3334

Counsel for Plaintiffs and the Proposed Classes