UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FREE FREEHAND CORP. and JABEZ PALMER, on Behalf of Themselves and All Others Similarly Situated, | Case No.: 11-CV-02174-LHK |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS |
| v. | |
| ADOBE SYSTEMS INC., | |
| Defendant. | |

Now before the Court is Defendant Adobe Systems Inc.'s ("Adobe") motion to dismiss Plaintiff Free FreeHand's and Plaintiff Jabez Palmer's (collectively "Plaintiffs") first amended complaint. ECF No. 20. The Court held a hearing on the motion on November 8, 2011. Having considered the parties' briefing and arguments, the Court GRANTS in part and DENIES in part Adobe's motion for the reasons explained below.

## I.    Factual Background

This antitrust case arises out of Adobe's 2005 acquisition of FreeHand, a professional vector graphic illustration software, which, prior to the 2005 acquisition, competed with Adobe's professional vector graphic illustration software, Illustrator. FAC ¶ 1. Plaintiffs allege that "since acquiring FreeHand, Adobe has significantly raised the price of Illustrator while, at the same time, effectively removing FreeHand from the market by failing to update the program." *Id.*

Plaintiff Free FreeHand is a non-profit corporation comprising 5,500 members who are graphic design professionals and believe that FreeHand is a superior product to Illustrator. *Id.* ¶¶ 7-9. Free FreeHand members own FreeHand software licenses for either Windows or Macintosh,

Case No.: 11-CV-02174-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

United States District Court
For the Northern District of California

and most members have purchased software licenses for Illustrator. *Id.* ¶¶ 10-11. Plaintiff Jabez Palmer, a member of Free FreeHand, owns a software license for FreeHand and purchased a software license for Illustrator. *Id.* at ¶ 12.

In 1994, Adobe acquired Aldus, a software company that was licensed to market and sell FreeHand. *Id.* ¶ 57. The FTC challenged Adobe's acquisition of Aldus, charging that the effect of the acquisition may be substantially to lessen competition, or to tend to create a monopoly in the market for professional illustration software. *Id.* ¶¶ 58-59 (citing *In the Matter of Adobe Sys. Inc., et al.*, 118 F.T.C. 940, 942 (Oct. 18, 1994)). The FTC found that the Adobe-Aldus merger would: (1) increase the already high concentration in the relevant market; (2) eliminate Aldus as a substantial independent competitive force in the relevant markets; (3) eliminate actual, direct, and substantial competition between Adobe and Aldus; (4) eliminate competition between the two closest substitutes, Illustrator and FreeHand; (5) allow the merged firm unilaterally to exercise market power; (6) allow the merged firm to raise prices, either directly or through reduced discounting, promotion, or services, on either Illustrator or FreeHand or on both products; (7) allow the merged firm to reduce innovation by delaying or reducing product development; and (8) increase the likelihood of coordinated interaction. *Id.* ¶ 61.

On October 18, 1994, Adobe, Aldus, and the FTC signed a consent order divesting Adobe of FreeHand. The divestiture's purpose was "to ensure the continuation of FreeHand as an ongoing viable Professional Illustration program, to maintain FreeHand as an independent competitor in the Professional Illustration Software Business, and to remedy the lessening of competition resulting from the acquisition as alleged in the Commission's complaint." *Id.* ¶ 62 (quoting *Adobe*, 118 F.T.C. at 946). The FTC also prohibited Adobe from acquiring FreeHand or any other professional illustration software for a period of 10 years. *Id.* ¶ 63 (citing *Adobe*, 118 F.T.C. at 947). In 2005, at the conclusion of the 10 year non-acquisition period mandated by the FTC consent order, Adobe acquired FreeHand by purchasing Macromedia, which had itself acquired FreeHand in the intervening period. *Id.* ¶ 65.

Plaintiffs allege that "[t]here are two relevant product markets for antitrust analysis in this action: (1) the market for professional vector graphic illustration software for Macintosh operating

2

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   systems (the 'Mac OS Market') and (2) the market for professional vector graphic illustration

2   software for Windows operating systems (the 'Windows OS Market')." *Id.* ¶ 32.  They allege that

3   the geographic scope of these markets is global, or, in the alternative, the entire United States. *Id.* ¶

4   33.  Plaintiffs allege that Illustrator and FreeHand are the only products competing in the Mac OS

5   Market and that Illustrator, FreeHand, and CorelDraw are the only products competing in the

6   Windows OS Market. *Id.* ¶¶ 47-48.  Plaintiffs allege that since acquiring FreeHand, Adobe

7   possesses 100% market share of the Mac OS Market and 80% of the Windows OS Market. *Id.* ¶¶

8   52-53.  Plaintiffs claim that Adobe "has the power to extract supracompetitive prices in the relevant

9   markets." *Id.* ¶ 56.

10      Plaintiffs allege that "[t]here are currently no close substitutes for professional graphic

11   illustration software, and no other product significantly constrains the price of this software." *Id.* ¶

12   50.  Plaintiffs also claim that there are high barriers to entry into the market.

13      First, Plaintiffs claim that "[m]arketing a technically comparable or even an improved

14   software program would be difficult, time consuming, and unlikely because of network

15   externalities associated with the current competitors' extensive installed user bases." *Id.* at 51.

16      Second, Plaintiffs claim that "any new software product would have to simultaneously

17   overcome a second network effect in the commercial printer software market." *Id.*  According to

18   Plaintiffs, "[c]ommercial printers have their own software, which needs to be compatible with the

19   files the designer sends to be printed.  Commercial printers generally accept only Adobe,

20   FreeHand, and, to a lesser extent, Corel files.  Designers who want to print commercially cannot

21   use file types that commercial printers cannot accept." *Id.* ¶ 39.

22      Plaintiffs allege that since acquiring FreeHand, Adobe has continually and significantly

23   increased the price of Illustrator.  In 2004, prior to the acquisition, the price for Illustrator was

24   $399.  In 2005, presumably after the merger, Adobe raised the price of Illustrator to $499.  In 2008,

25   Adobe released a new version of Illustrator and again raised the price of Illustrator to $599. *Id.* ¶

26   68.

27      Plaintiffs also allege that Adobe purposefully misled the public, fostering the perception

28   that Adobe would continue to support and develop FreeHand. *Id.* ¶ 69.  On June 1, 2006,

3

*MacWorld* quoted an Adobe representative stating that the company "plans to continue to support Freehand," "that it would 'develop Freehand 'based on [its] customer's needs," and that the product would not be discontinued. *Id.* On May 16, 2007, Plaintiffs allege that Adobe revealed "its true intentions" when its product manager, Jack Nack, wrote in a blog article titled "FreeHand No Longer Updated; Moving to Illustrator" that Adobe would not "develop and deliver any new feature-based releases of FreeHand, or . . . deliver patches or updates for new operating systems or hardware." *Id.* ¶ 70.

Plaintiffs allege that "Adobe has succeeded in ending competition" and "effectively acknowledged its intent to cripple innovation" in the relevant markets. *Id.* ¶ 72. Plaintiffs further claim that:

> Adobe has used the asset of FreeHand in a different manner from the way FreeHand was used when and before FreeHand was acquired in the Adobe-Macromedia merger. Before the acquisition, FreeHand was an actively developed and supported piece of software and a living, breathing product. After the acquisition, Adobe has effectively crippled and killed FreeHand while scavenging its bones for features to incorporate into Illustrator.

*Id.* ¶ 74.

Plaintiffs also allege that Adobe obtained and protects its monopoly power through anticompetitive conduct such as by "purchas[ing] and subsequent[ly] fail[ing] to update FreeHand," "crippling FreeHand," "providing materials to help consumers transition from FreeHand to Illustrator," and "bundling Illustrator . . . with other Adobe products . . . [thereby] limiting the ability of potential rival professional software manufacturers to enter the market without a full array of graphics software." *Id.* ¶¶ 75-77. Plaintiffs also allege that, despite repeated requests from Free FreeHand members to release FreeHand's source code to the public, Adobe has refused to make its source code public. *Id.* ¶¶ 88-89.

Adobe's actions have allegedly harmed Plaintiffs by exacting "unlawful monopoly prices" for purchases of Illustrator and FreeHand. *Id.* ¶¶ 95, 97. Plaintiffs also face the potential harm of their versions of FreeHand becoming incompatible with future versions of computer operating software and losing their designs because images created in FreeHand are not useable when imported into Illustrator. *Id.* ¶ 97.

4

## II.     Judicial Notice

As a general rule, a district court may not consider any material beyond the pleadings in ruling on a 12(b)(6) motion. *Lee v. Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). However, a court may take judicial notice of "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). In ruling on this motion, the Court considers the Federal Trade Commission's ("FTC") 1994 Consent Order, whose contents are alleged in the first amended complaint ("FAC") and whose authenticity no party questions. *See In the Matter of Adobe Sys. Inc., et al.*, 118 F.T.C. 940, 1994 WL 16011114 (Oct. 18, 1994).

## III.     Procedural Background

Plaintiffs filed the instant lawsuit, on behalf of themselves and all others similarly situated, on May 3, 2011. ECF No. 1. Adobe filed a motion to dismiss on July 7, 2011. ECF No. 10. On July 10, 2011, Plaintiffs filed their First Amended Complaint ("FAC"), which mooted Adobe's first motion to dismiss. ECF No. 19.

The FAC alleges claims for relief under the following statutes: (1) Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) Section 7 of the Clayton Act, 15 U.S.C. § 18; (3) California Business and Professions Code § 16700 *et seq.*; (4) California Business and Professions Code § 17200 *et seq.*; (5) Washington Consumer Protection Act, RCW 19.86.020 *et seq.*; and (6) Washington Consumer Protection Act, RCW 19.86.040 *et seq. Id.* at 27-30. Plaintiffs seek the following relief: (1) treble damages; (2) an injunction requiring divestiture of FreeHand; and (3) attorney's fees and costs. *Id.* at 30.

Plaintiffs seek to represent four classes as follows:

a. The first class, "Mac Damages Class," seeks damages only for violations of 15 U.S.C. §§ 2, 18; Cal. Bus. & Prof. Code § 16700 *et seq.* and RCW 19.86.020 *et seq.* and is defined as:

All persons or entities that purchased FreeHand or Illustrator for a Macintosh operating system from at any time since Adobe's purchase of Macromedia in 2005 (the "Class Period").
* * *

Case No.: 11-CV-02174-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

United States District Court
For the Northern District of California

b. The second class, "Windows Damages Class," seeks damages only for violations of 15 U.S.C. §§ 2, 18; Cal. Bus. & Prof. Code § 16700 *et seq.* and RCW 19.86.020 *et seq.* and is defined as:

All persons or entities that purchased FreeHand or Illustrator for a Windows operating system from at any time since Adobe's purchase of Macromedia in 2005 (the "Class Period").

\* \* \*

c. The third class, "Mac Injunctive Class," seeks declaratory and injunctive relief only for violations of 15 U.S.C. §§ 2, 18; Cal. Bus. & Prof. Code § 16700 *et seq.* and RCW 19.86.020 *et seq.* and is defined as:

All persons or entities that currently use professional vector graphic illustration software on a Macintosh operating system, in addition to Free FreeHand.

\* \* \*

d. The fourth class, "Windows Injunctive Class," seeks declaratory and injunctive relief only for violations of 15 U.S.C. §§ 2, 18; Cal. Bus. & Prof. Code § 16700 *et seq.* and RCW 19.86.020 *et seq.* and is defined as:

All persons or entities that currently use professional vector graphic illustration software on a Windows operating system, in addition to Free FreeHand.

*Id.* cv¶¶22-23.

On August 3, 2011, Adobe filed the instant motion to dismiss Plaintiffs' FAC.  ECF No. 20.

## IV.    Legal Standards

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  On a motion to dismiss, "all allegations of material fact are taken as true and construed in the light most favorable to [Plaintiffs]."  *Facebook, Inc. v. MaxBounty, Inc.*, 274 F.R.D. 279, 282 (N.D. Cal. 2011) (citing *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996)); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  However, the Court need not accept as true "allegations that contradict matters properly subject to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  While a complaint need not allege detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550

6

U.S. 544, 570 (2007)).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 1949.

As the Ninth Circuit has stated, "a claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations only when the running of the statute is apparent on the face of the complaint.  A complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 3055 (U.S. 2011) (internal citations and quotations omitted).

Claims sounding in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  A plaintiff alleging fraud "must state with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9(b).  To satisfy this standard, the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).  Accordingly, claims sounding in fraud must allege "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

If a court grants a motion to dismiss, leave to amend should be granted unless the pleading could not possibly be cured by the allegation of other facts.  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

### V.    Discussion

Adobe argues that Plaintiffs fail to state a claim upon which relief can be granted.  Adobe also argues that Plaintiffs' claims accrued in 2005 when, with the Department of Justice's approval, Adobe acquired FreeHand.  Thus, Adobe contends that Plaintiffs' claims are barred by a four-year statute of limitations, which both parties agree apply to all of Plaintiffs' claims.  The Court analyzes the adequacy of Plaintiffs' pleading first and the statute of limitations second.

### A.  Adequacy of Federal Antitrust Claims

Adobe argues Plaintiffs have failed to properly plead an unlawful monopolization claim under Section 2 of the Sherman Act.  The Court disagrees.

Section 2 of the Sherman Act makes it a crime to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ."  15 U.S.C. § 2 (2006).  Section 4 of the Clayton Act, in turn, establishes a private right of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" and provides "threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  15 U.S.C. § 15 (2006).  Section 16 of the Clayton Act establishes a right to injunctive relief "against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26 (2006).

To state an unlawful monopolization claim, a plaintiff must allege "(1) [p]ossession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury."  *SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996).

Plaintiffs have alleged, and Adobe does not dispute, that Adobe has monopoly power in the global and/or national Macintosh and Windows markets for professional vector graphic illustration software.  FAC ¶¶ 32, 33, 47-48, 52-53, 56.  Thus, Plaintiffs have alleged possession of monopoly power in the relevant market, the first element of a monopolization claim.  Accordingly, the Court looks to whether Plaintiffs have adequately alleged that Adobe willfully acquired or maintained that power, and whether Adobe's conduct caused Plaintiffs' antitrust injury.  FAC ¶¶ 110-11.

As the Supreme Court has stated, a Section 2 violation requires, "in addition to the possession of monopoly power in the relevant market, 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  "The possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct."  *Id.*  According to the Ninth Circuit, "[a]nticompetitive conduct is behavior that tends to impair the opportunities of rivals and

8

either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008); *see also Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) (use of monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor" is anticompetitive conduct).  As a sister court has observed, "'anticompetitive' conduct may include otherwise *legal* conduct."  *Tele Atlas N.V. v. NAVTEQ Corp.*, 05-CV-1673-RS, 2008 WL 4911230, at *1 (N.D. Cal. Nov. 13, 2008) (citing *Trinko*, 540 U.S. at 407; *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985); *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001)) (emphasis in original).

Adobe argues that a series of practices that are neither exclusionary nor anticompetitive cannot combine to violate Section 2 of the Sherman Act.  Reply 9.  Plaintiffs, on the other hand, maintain that they can state a Section 2 claim by alleging a series of practices that are anticompetitive, even if some of the activities would be lawful if viewed in isolation.  Opp'n 11.

These positions are not inconsistent.  Under the theory of monopoly broth, "[t]here are kinds of acts which would be lawful in the absence of monopoly but, because of their tendency to foreclose competitors from access to markets or customers or some other inherently anticompetitive tendency, are unlawful under Section 2 if done by a monopolist."  *City of Mishawaka v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980).  The Ninth Circuit has likewise stated that it is not "proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."  *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376, 1378 (9th Cir. 1992) (following *City of Mishawaka*, 616 F.2d 976); *see also Tele Atlas*, 2008 WL 4911230, at *1 ("[C]ourts must consider all of an alleged monopolist's related conduct in the aggregate.").

Thus, the Court analyzes the alleged anticompetitive practices below to determine whether, in the aggregate, they tend to reduce competition and maintain Adobe's monopoly power.

**United States District Court**
For the Northern District of California

9

a.   *Post-Merger Conduct and Monopoly Maintenance*

Plaintiffs allege the following post-merger anticompetitive conduct: (1) charging monopolist prices; (2) discontinuing support for and development of FreeHand; (3) bundling Illustrator with other Adobe products; and (4) declining to release FreeHand's source code to the open source community.  Adobe argues that none of these alleged acts, either independently or combined, violates the antitrust laws.  *See* Mot. 12; Reply 7.  The Court discusses each alleged anticompetitive act in turn.

i.   *Supracompetitive Prices*

Plaintiffs allege that Adobe raised the price of Adobe from $399 to $499 in 2005, and again from $499 to $599 in 2008.  FAC ¶ 68.

Plaintiffs do not explain, either in their complaint, or in their opposition brief, how higher prices for Illustrator tend to reduce competition in the relevant markets for professional vector graphics illustration software.  Adobe argues that unilateral decisions to increase price are entirely lawful, even if done by a monopolist.  Mot. 12; Reply 7.

Although monopolist pricing, by itself, is insufficient to state a monopolization claim, the Court disagrees with Adobe's blanket statement that "even an alleged monopolist is entitled to raise prices."  Mot. 12.  For example, when a company uses predatory pricing to reduce competition and then raises prices to a supracompetitive level, "[c]onsumers would not be harmed until the predator attained monopoly power through the predatory pricing and subsequently raised prices to supra-competitive levels to recoup the lost profits."  *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 152 (C.D. Cal. 2007).  Adobe's claim that an alleged monopolist is "entitled" to raise prices relies on a quotation from a Supreme Court opinion that discussed the lawfulness of raising prices when a monopoly is acquired lawfully.  The Supreme Court noted that the offense of monopolization "requires, in addition to the possession of monopoly power in the relevant market, 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Trinko*, 540 U.S. at 407 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).  Although the Court stated that the "mere possession of monopoly power, and the concomitant charging of monopoly

1    prices, is not only not unlawful; it is an important element of the free-market system," the Court

2    made clear that "monopoly power is unlawful [if] it is accompanied by an element of

3    anticompetitive *conduct*."  *See id.* (emphasis in original).

4           Plaintiffs allege that Adobe willfully acquired monopoly power through its acquisition of

5    FreeHand in 2005.  FAC ¶¶ 1, 75-76.  The mere fact that the Department of Justice "cleared" the

6    merger in 2005 -- a fact that does not appear in the Complaint, but that Plaintiffs apparently

7    concede -- does not mean that Plaintiffs are precluded from alleging that the merger itself was

8    unlawful.  *See, e.g.*, Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 315c (3d ed. 2007)

9    (hereinafter "Areeda & Hovenkamp") (DOJ "lacks the power to immunize transactions generally"

10   and DOJ clearance "cannot bind a court, a private plaintiff, or the FTC, although a court might

11   choose to give it weight in the same way that it can consider enforcement guidelines.").  Plaintiffs

12   also claim that Adobe maintained its monopoly power through anticompetitive conduct such as

13   discontinuing FreeHand and channeling FreeHand customers to Illustrator, which Adobe bundled

14   with other Adobe products.  FAC ¶¶ 1, 75-77.  Thus, in the context of the facts as pled, and read in

15   the light most favorable to Plaintiffs, Adobe, as a monopolist engaging in other alleged

16   anticompetitive conduct to maintain that monopoly, would not be lawfully entitled to raise prices.

17                        *ii.*    *Ceasing Development of FreeHand*

18          Plaintiffs allege that since acquiring FreeHand in 2005, Adobe has not delivered any new

19   features for FreeHand and has actively driven existing users of FreeHand to use Illustrator instead.

20   FAC ¶¶ 70-72.  Plaintiffs claim that Adobe acknowledged its intent to cease development of

21   FreeHand and to cripple FreeHand's functionality on May 16, 2007.  *Id.*

22          Adobe argues that all companies are entitled to make unilateral product line decisions,

23   including discontinuing products, Mot. 13 (citing *Glen Holly Entm't Inc. v. Tektronix, Inc.*, 352

24   F.3d 367, 372 (9th Cir. 2003)).[1]

25

26

27   _____

     [1] To the extent that Adobe also relies on *Brantley v. NBC Universal, Inc.*, No. 09-CV-56785, 2011
28   WL 2163961, at *5 (9th Cir. June 3, 2011), this decision was withdrawn on October 31, 2011, and
     has no precedential value.

Case No.: 11-CV-02174-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Adobe's argument relies on an overbroad reading of Ninth Circuit dictum.  In reversing the

2 district court's dismissal of plaintiff's antitrust claim, the Ninth Circuit in *Glen Holly* stated that the

3 district court was correct in noting that the antitrust laws "do not preclude any manufacturer from

4 independently discontinuing a product line any more than they preclude a manufacturer from

5 independently raising prices." *Glen Holly*, 352 F.3d at 372.  This statement merely stands for the

6 unremarkable proposition that not all manufacturer decisions to independently raise prices or

7 discontinue product lines violate the antitrust laws.  But the Ninth Circuit also noted that "[o]ne

8 form of antitrust injury is coercive activity that prevents its victims from making free choices

9 between market alternatives" and found that the alleged injury "flowed from the discontinuation of

10 the only competing product on the market by agreement between the only two competitors in the

11 market," resulting in "no viable choice between market alternatives." *Id.* at 374.  Thus, *Glen Holly*

12 does not preclude the possibility that a unilateral decision to discontinue a product line can be

13 anticompetitive.

14    Adobe also argues that integrating acquired assets from FreeHand and removing a product

15 from the market place is "rational and normal business conduct" that could only reduce a firm's

16 purported market power and give greater opportunities to its rivals.  *See* Br. 13; Reply 7-8.

17    The Court disagrees.  As an initial matter, "the existence of valid business reasons in

18 antitrust cases is generally a question of fact not appropriate for resolution at the motion to dismiss

19 stage." *Tucker v. Apple Computer, Inc.*, 493 F. Supp. 2d 1090, 1101 (N.D. Cal. 2006) (citing

20 *SmileCare Dental Group*, 88 F.3d at 786).

21    Moreover, that Adobe was able to maintain its high market share, FAC ¶ 53, despite

22 increasing Illustrator's price in 2008, FAC ¶ 68, after announcing that Adobe would essentially be

23 discontinuing FreeHand in 2007, FAC ¶ 70, undermines Adobe's assertion that discontinuing

24 FreeHand actually increased competition.  It is possible that facts developed in discovery may

25 show that discontinuing FreeHand benefited CorelDraw in the Windows Market.  In the Mac

26 Market, however, professional designers allegedly had no choice other than Illustrator if they

27 wanted to purchase professional vector design software that was interoperable with the latest

28 operating systems.  FAC ¶ 72.  Furthermore, as discussed below, Plaintiffs allege that Adobe was

12

1    bundling Illustrator with other Adobe software products.  Plaintiffs also allege that Adobe

2    encouraged existing FreeHand users to purchase the bundled Illustrator product.  *Id.* ¶¶ 72-74.

3    Thus, it is reasonable to infer that Adobe's discontinuation of FreeHand and channeling of

4    FreeHand users to Illustrator made it more difficult for potential competitors of Illustrator, who did

5    not have a full array of graphics software, to enter the market.  This barrier to entry is in addition to

6    the already existing barrier due to the alleged "network externalities associated with Illustrator and

7    FreeHand's extensive installed user bases and adoption as the standard file types accepted by

8    commercial printers."  *Id.* ¶ 54.  Therefore, in the context of the facts as alleged in this case, it is

9    reasonable to infer that Adobe's alleged crippling of FreeHand harmed competition.

10       Adobe's reliance on *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, Case No.

11   SACV-4-1455-CJC(AJWx), 2011 WL 2268066 (C.D. Cal. June 7, 2011), for the proposition that

12   Adobe's decision to cripple FreeHand was procompetitive, is unavailing.  The *Arminak* court stated

13   that integrating acquired assets into existing products to "more effectively compete for [the

14   acquired product's] former customers and meet customer needs" represents "vigorous competition

15   on the merits of the type that the antitrust laws seek to promote."  *Id.* at *7.  *Arminak* is inapposite

16   because plaintiff there was defendant's competitor, not a consumer, and thus had not suffered

17   antitrust injury.  Furthermore, unlike here, the plaintiff in *Arminak* had abandoned its monopoly

18   broth theory of liability, *id.* at *3, and the procedural posture was summary judgment, not a motion

19   to dismiss.  Moreover, based on the evidence produced in discovery, the court found that

20   defendant's alleged anticompetitive conduct, which included introduction of a new product line

21   and integration of acquired assets into defendant's existing product line, was actually

22   procompetitive.  *Id.* at *4-5.  Here, by contrast, reading the alleged facts in the light most favorable

23   to Plaintiffs, it is reasonable to infer that Adobe's discontinuation of FreeHand, in aggregate with

24   Adobe's other conduct, reduced competition.  Accordingly, Plaintiffs can attempt to adduce

25   evidence in discovery to support this allegation.

26                          *iii.*    *Bundling*

27       Plaintiffs argue that Adobe "bundled Illustrator with other Adobe graphic design products,

28   raising significant entry barriers for potential rivals to enter the market without a full array of

Case No.: 11-CV-02174-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

**United States District Court**
For the Northern District of California

graphics software." Opp'n 10 (citing FAC ¶ 77). At the hearing, Plaintiffs admitted that Adobe's alleged bundling could not stand alone as a Sherman Act violation, but Plaintiffs argued that Adobe's alleged bundling could form part of a monopoly broth claim. Hr'g Tr. 15:4.

Adobe did not challenge Plaintiffs' bundling claims in its opening brief. In its reply, Adobe argued that bundling almost always benefits consumers and that Plaintiffs' bundling claim is neither well pled nor relevant to the claims and relief that Plaintiffs seeks to pursue. Reply 8 (citing *Cascade Health* Solutions, 515 F.3d 883).

Although the Court agrees with Adobe, and Plaintiffs concede, that Plaintiffs have not pled sufficient facts for a standalone bundling claim, the Court disagrees with Adobe that Plaintiffs' allegations of bundling are not relevant to Plaintiffs' Section 2 claim. As stated earlier, "anticompetitive conduct may include otherwise *legal* conduct." *Tele Atlas N.V. v. NAVTEQ Corp.*, 05-CV-1673-RS, 2008 WL 4911230, at *1 (N.D. Cal. Nov. 13, 2008). Here, Plaintiffs have alleged that "Adobe's bundling of Illustrator constitutes a significant entry barrier by limiting the ability of potential rival professional software manufacturers to enter the market without a full array of graphics software." FAC ¶ 77. Plaintiffs have therefore alleged that Adobe's bundling foreclosed competition, especially when viewed in light of Adobe's discontinuation of FreeHand and active encouragement of existing FreeHand users to switch to Illustrator. Accordingly, Plaintiffs can adduce evidence to show that Adobe's bundling foreclosed competition. *Cf. Masimo Corp. v. Tyco Health Care Group, L.P.*, No. 2-CV-4770-MRP, 2004 WL 5907538 (C.D. Cal. June 10, 2004) (allowing plaintiffs to present evidence on whether bundled rebates reduced competition and therefore constituted anticompetitive conduct for monopoly maintenance claim).

    iv.  *Withholding of Source Code from Open Source Community*

Plaintiffs argue that "Adobe has also refused requests to release FreeHand's source code to the open source community, notwithstanding that FreeHand is a 'dead' product as far as Adobe is concerned." Opp'n 11 (citing FAC ¶ 11). Adobe, on the other hand, argues that it has no duty to license its technology to foster competition or to give away its technology for others to clone. Mot. 13. At the hearing and in their briefing, Plaintiffs were unable to point the Court to any authority

United States District Court
For the Northern District of California

14

1    supporting the proposition that a company's refusal to give out its source code is anticompetitive or

2    violates the antitrust laws.  Hr'g Tr. 13:7-11.

3         The Court agrees with Adobe that Adobe has no duty to give away its technology for others

4    to clone.  *See United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647 (9th Cir. 1981).

5    Accordingly, the Court does not consider this conduct in evaluating the overall effect of Adobe's

6    alleged anticompetitive conduct.

7                    *v.    The Aggregate Effect of the Anticompetitive Conduct*

8         In summary, Plaintiffs have plausibly alleged that Adobe willfully acquired monopoly

9    power and maintained that power through anticompetitive conduct.  If, as alleged, Adobe ceased

10   the development of FreeHand while steering existing FreeHand users to a bundled product, thereby

11   further raising already high barriers to entry, it is plausible to infer that this conduct tended "to

12   impair the opportunities of rivals" and "did not further competition on the merits."  *Cascade Health*

13   *Solutions*, 515 F.3d at 894.

14        This is not a case "where none of the alleged conduct was anticompetitive, even when

15   combined."  *Tele Atlas*, 2008 WL 4911230, at * 2 (quoting *Cal. Computer Prods., Inc. v. IBM*

16   *Corp.*, 613 F.2d 727, 745 (9th Cir. 1979)).  Indeed *California Computer*, on which Adobe relies,

17   found that monopoly broth was inapplicable where a competitor-plaintiff benefited from

18   defendant's alleged anti-competitive behavior.  Thus, in that case plaintiff did not suffer antitrust

19   injury.  It is therefore inapposite here, where, as discussed below, consumers allegedly suffered

20   antitrust injury.  Therefore, *California Computer* does not foreclose the availability of the

21   monopoly broth theory in these circumstances.

22        Furthermore, this Court need not decide whether a plaintiff can survive a motion to dismiss

23   by alleging a series of procompetitive acts that, in the aggregate, combine to violate the antitrust

24   laws.  The allegations of anticompetitive acts, and their alleged aggregated anticompetitive effect,

25   fall squarely within the bounds of established monopoly broth theory.  *Cf. Tele Atlas*, 2008 WL

26   4911230, at *1.

27        Thus, Plaintiffs have sufficiently alleged the second element of a monopolization claim:

28   willful acquisition or maintenance of monopoly power.

Case No.: 11-CV-02174-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

*b.   Antitrust Injury*

In its Reply, Adobe raises for the first time that Plaintiffs have not alleged that Adobe's conduct caused them any antitrust injury.  Reply 8.  The Court disagrees.

To have standing to bring an antitrust claim, a plaintiff must allege antitrust injury, that is, injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  "[I]njury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny, since it is inimical to the antitrust laws to award damages for losses stemming from continued competition." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (internal quotations and alterations omitted).

Plaintiffs claim that Adobe's anticompetitive conduct has injured them by: (1) allowing Adobe to charge Plaintiffs supracompetitive prices for Illustrator, FAC ¶ 68; (2) decreasing innovation in the market for professional vector graphics software, FAC ¶ 73; and (3) rendering Plaintiffs' existing artwork created on FreeHand obsolete, FAC ¶¶ 95, 97.  These are the types of injuries that commonly satisfy the antitrust standing requirement.  *Glen Holly*, 352 F.3d at 374; *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) ("[T]he antitrust laws are only concerned with acts that harm 'allocative efficiency and raise[ ] the price of goods above their competitive level or diminish[ ] their quality.'"); *see also Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*, Case No. 08-CV-01035, 2008 WL 4830740, at *4  (N.D. Cal. Nov. 6, 2008) (noting that direct purchasers of software would have antitrust standing stemming from injury of paying supracompetitive prices); *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1036 (C.D. Cal. 2007) (allegations of stifling innovation in the market sufficient for antitrust injury).  Thus, Plaintiffs have pled antitrust injury.

Accordingly, Plaintiffs have alleged sufficient facts to state a monopoly maintenance claim under Section 2 of the Sherman Act.

Case No.: 11-CV-02174-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

**United States District Court**
For the Northern District of California

**B.     Adequacy of State Law Claims**

The parties devote no more than three pages to discussing Plaintiffs' state law claims.  Both parties agree that Plaintiffs' claims under the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; the Washington Consumer Protection Act RCW 19.86.020; and the Washington antitrust statutes RCW 19.86.040 *et seq.*, rise and fall with Plaintiffs' federal claims. Hr'g Tr. 6:18-7:6.  The Court found above that Plaintiffs have adequately stated a claim for their federal antitrust claims.  Accordingly, Plaintiffs have also stated a claim under these state statutes.

Plaintiffs also seek relief under California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*  Adobe argues that the Cartwright Act does not address unilateral conduct because it is modeled after Section 1 of the Sherman Act, which Plaintiffs do no not invoke here.  Mot. 15 (citing *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1204 (N.D. Cal. 2008)).  The Court agrees with Adobe.  *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 198 Cal. App. 4th 1366, 1386 (2011) ("[T]he Cartwright Act contains no provision parallel to the Sherman Act's prohibition against monopolization (15 U.S.C. § 2), and the Cartwright Act applies only to a 'combination' involving 'two or more persons' (§ 16720), not to *unilateral* conduct.") (emphasis in original); *see also Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986) (noting that Cartwright Act does not address unilateral conduct).

To state a claim under the Cartwright Act, Plaintiffs "must allege that (1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce."  *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 961, 965 (N.D. Cal. 2007) (noting that the analysis under the Cartwright Act mirrors the analysis under Section 1 of the Sherman Act); *see also Chicago Title Ins. Co. v. Great W. Fin. Corp.*, 69 Cal. 2d 305, 318 (1968).  Plaintiffs have alleged no agreement, conspiracy, or combination between two or more entities.

Plaintiffs contend that there is a valid Cartwright Act claim "[i]f a 'single trader' pressures customers or dealers into pricing arrangements . . . ."  Opp'n 11 (quoting *Davis v. Pac. Bell*, 204 F. Supp. 2d 1236, 1243 (N.D. Cal. 2002)).  In *Davis*, Judge Illston denied defendant's motion to

17

dismiss plaintiffs' Cartwright Act Claim where defendant telephone company coercively prevented plaintiffs-telephone customers from migrating to competitors by making misrepresentations and by interrupting and disconnecting telephone service to migrating customers. Even if *Davis* stands for the proposition that unilateral conduct can form the basis for a Cartwright claim if it amounts to coercion, Plaintiffs do not allege that Adobe coerced Plaintiffs by, for example, misleading them into buying its products or by taking punitive action against Plaintiffs seeking to migrate to Adobe's competitors.

Thus, Plaintiffs' Cartwright Act claim fails as a matter of law. Accordingly, Plaintiffs' third claim for relief is DISMISSED with leave to amend.

### C.      Statute of Limitations as to All Claims

The parties agree that all of Plaintiffs' claims are governed by a four-year statute of limitations. Opp'n 3; Reply 2. However, the parties' briefing focuses on the federal antitrust claims and tolling doctrines, and Defendants do not suggest that Plaintiffs' state law claims are time-barred for any independent reasons. *See* Mot. 14; Reply 11 ("Plaintiffs [state law claims] . . . are bootstrapped to their federal antitrust claims"). Accordingly, the Court limits its statute of limitations analysis to whether Plaintiffs' claims under the federal antitrust laws, Section 2 of the Sherman Act and Section 7 of the Clayton Act, are time-barred.

Absent tolling, any federal antitrust cause of action accruing prior to May 3, 2007, the date Plaintiffs filed their original complaint, is time-barred. "Generally, [an antitrust cause] of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. . . . [E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); *see also AMF, Inc. v. Gen. Motors Corp.*, 591 F.2d 68, 70 (9th Cir. 1979) (same).

Adobe argues that Plaintiffs' cause of action accrued when Adobe acquired Macromedia in 2005 and should therefore be dismissed as time-barred. Adobe contends that "courts consistently hold that if a monopoly is created by a single identifiable act and is not perpetuated by an ongoing

1   policy, the [four-year] statute of limitations runs from the [time of] commission of the act,

2   notwithstanding that high prices may last indefinitely into the future." Mot. at 6 (citing Areeda &

3   Hovenkamp, *supra*, § 320c4).

4          Plaintiffs contend that even if the Adobe-Macromedia merger itself triggered the statute of

5   limitations in 2005, their claims are not time-barred under four tolling theories: (1) the continuing

6   violation doctrine; (2) the discovery rule; (3) the "new use" exception to the Clayton Act's statute

7   of limitations; and (4) fraudulent concealment. The Court analyzes each of these theories in turn.

8                            **1.        Continuing Violation**

9          Plaintiffs argue that their antitrust claims are not barred by the statute of limitations because

10  Adobe's monopolization constitutes a "continuing violation."

11         Adobe, on the other hand, contends that the "continuing violation" doctrine does not apply

12  in the merger context. To support this position, Adobe cites cases declining to apply the continuing

13  violation doctrine to claims under Section 7 of the Clayton Act. Mot. 6 (citing *Midwestern Mach.*

14  *Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004); *Concord Boat Corp. v. Brunswick*

15  *Corp.*, 207 F.3d 1039, 1052 (8th Cir. 2000)). Although the *Midwestern Machinery* court stated that

16  "[o]nce a merger is completed, there is no continuing violation possible *under § 7* [of the Clayton

17  Act] that would justify extending the statute of limitations beyond four years," 392 F.3d at 271, the

18  court made clear that "merged firms are still subject to the Sherman Act's prohibitions on

19  monopolization or attempts to monopolize." *Id.* at 272 (emphasis added). *See also Smith v. eBay*

20  *Corp.*, 10-CV-3825-JSW, 2012 WL 27718, at *3 (N.D. Cal. Jan. 5, 2012) (applying continuing

21  violation doctrine to toll Section 2 monopolization claim in context of an acquisition).

22         For Plaintiffs' Clayton Act Section 7 claim, the Court finds below in Section V.C.2 that

23  Plaintiffs can rely on the "new use" exception to the Clayton Act's statute of limitations. Thus, the

24  Court need not reach the question of whether the continuing violation doctrine applies to Plaintiffs'

25  claim under Section 7 of the Clayton Act. Accordingly, the Court limits its analysis under the

26  continuing violation doctrine to Plaintiffs' claim under Section 2 of the Sherman Act, where the

27  doctrine applies. *Smith v. eBay*, 2012 WL 27718, at *3.

28

Case No.: 11-CV-02174-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

1      Under the "continuing violation" doctrine, "each overt act that is part of the [antitrust]

2  violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the

3  plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*,

4  521 U.S. 179, 189 (1997) (internal citations and quotations omitted); *Pace Indus. v. Three Phoenix*

5  *Co.*, 813 F.2d 234, 237 (9th Cir. 1987) ("A continuing violation is one in which the plaintiff's

6  interests are repeatedly invaded and a cause of action arises each time the plaintiff is injured.").  In

7  the Ninth Circuit, an overt act restarts the statute of limitations if it: (1) is "a new and independent

8  act that is not merely a reaffirmation of a previous act"; and (2) "inflict[s] new and accumulating

9  injury on the plaintiff."  *Pace*, 813 F.2d at 237.

10      Plaintiffs allege that Adobe acquired monopoly power and charged supracompetitive prices

11  in 2005, after the merger was consummated.  Hr'g Tr. 11:14-15.  Thus, Plaintiffs suffered injury,

12  and their monopolization claim initially accrued as early as 2005.  However, as discussed in

13  Section V.A.1 above, Plaintiffs' allegations also support the reasonable inference that Adobe

14  perpetuated its monopoly power and caused Plaintiffs new injury after the merger, through the

15  following "new and independent acts:" (1) ceasing development of FreeHand; (2) channeling

16  existing FreeHand customers to Illustrator; and (3) bundling Illustrator with other Adobe software

17  products.

18      These are not mere "reaffirmations" of the merger such as "holding or using assets in the

19  same manner as at the time of acquisition," *Concord Boat*, 207 F.3d at 1052, or "continu[ing]

20  indefinitely to receive some benefit as a result of an illegal act performed in the distant past."

21  *Aurora Enters., Inc. v. NBC, Inc.*, 688 F.2d 689, 694 (9th Cir. 1982).  Rather, Adobe's alleged

22  post-merger acts here are more like an online auction provider's changes to its electronic payment

23  policy after acquiring an online payment service provider, which a sister court found to "constitute

24  overt acts, . . . [which] inflicted new and accumulating harm to [plaintiffs]."  *Smith v. eBay*, 2012

25  WL 27718, at *4 (taking note of eBay's banning of Google Checkout as an acceptable form of

26  payment and doubling the PayPal Buyer Protection to continue eBay's alleged efforts to

27  monopolize the market for online payment services for use in online auctions).  Just as in *Smith v.*

28  *eBay*, where plaintiffs' monopolization claim was not based "*solely* on the fact that eBay acquired

20

1    Paypal," *id.* at *5, here, Plaintiffs' claims are not based solely on the fact that Adobe acquired

2    Macromedia.

3         The exact date of Adobe's alleged post-merger anti-competitive acts and when Plaintiffs

4    suffered injury as a result of these acts is unclear from the face of the FAC.  However, it is

5    reasonable to infer that Adobe did not discontinue its updates to FreeHand until after Adobe

6    allegedly announced publicly its intent to do so on May 16, 2007, FAC ¶ 70.  It is also reasonable

7    to infer that Plaintiff suffered antitrust injury as a result, in the form of supracompetitive prices, in

8    2008.  FAC ¶ 68.

9         Taking the facts in the light most favorable to Plaintiffs, Plaintiffs' Section 2

10   monopolization claim therefore appears to be timely under the continuing violation doctrine.  At

11   the very least, it does not appear "beyond doubt that [Plaintiffs] can prove no set of facts that

12   would establish the timeliness of their claim." *Von Saher*, 592 F.3d at 969.  Accordingly, Adobe's

13   motion to dismiss is DENIED as to this claim.

14                    **2.      "New Use" Exception**

15        Plaintiffs argue that their Clayton Act Section 7 claim is also timely under the "new use"

16   exception to the Clayton Act's four-year statute of limitations.  Opp'n 6 (citing *Abbyy*, 2008 WL

17   4830740, at *6).  Under the "new use" exception, "[i]f assets are used in a different manner from

18   the way that they were used when the initial acquisition occurred, and that new use injures the

19   plaintiff, he or she has four years from the time that the injury occurs to sue." *See also Midwestern*

20   *Mach.,* 392 F.3d at 273 (citing *Klehr*, 521 U.S. at 188*; Zenith Radio*, 401 U.S. at 338).

21        Adobe argues that the "new use" exception is available only where a merger "cause[d] the

22   plaintiff no injury at the time it occurred, but subsequently the acquired assets were used in an

23   anticompetitive way not contemplated at the time of the acquisition and caused the plaintiff

24   injury." Reply 5 (citing Areeda & Hovenkamp, *supra*, § 329c5 at 311-12).  Adobe does not cite to

25   any cases, let alone any cases binding on this Court, for imposing these requirements.  Moreover,

26   the Court has been unable to find any case imposing them.  As such, the Court declines to require

27   Plaintiffs to plead that they suffered no injury at the time of the merger in order to avail themselves

28   of the "new use" exception to the Clayton Act's statute of limitations.

Case No.: 11-CV-02174-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   Plaintiffs argue that Adobe has used FreeHand differently from the way that it was used

2   when the initial acquisition occurred, and that this new use has injured Plaintiffs within the

3   limitations period.  *See* Opp'n 6.  Plaintiffs allege that prior to the 2005 merger, "FreeHand was an

4   actively developed and supported piece of software and a living breathing product."  FAC ¶ 74.

5   Plaintiffs allege that after the merger, Adobe "effectively crippled and killed FreeHand while

6   scavenging its bones for features to incorporate into Illustrator."  *Id.*  Plaintiffs allege that Adobe

7   ceased its development of FreeHand while steering existing FreeHand users to purchase the

8   bundled Adobe Illustrator product, thereby raising barriers to entry and decreasing competition.

9   FAC ¶¶ 72, 74, 77.  Plaintiffs allege that they were injured by supracompetitive prices and

10  decreased innovation.  *See* FAC ¶¶ 68, 73.  Thus, Plaintiffs have alleged that Adobe used FreeHand

11  in a different manner from the way that it was used at the time of the merger, and that the new use

12  injured Plaintiffs.  Accordingly, Plaintiffs have pled sufficient facts to avail themselves of the "new

13  use" exception to the Clayton Act's statute of limitations.

14      The case law Adobe cites does not support Adobe's position.  In *Abbyy USA Software*

15  *House, Inc.*, the court held that the "new use" exception was unavailable to plaintiff where plaintiff

16  did "not allege any specific and separate conduct, following the acquisition of Caere Corporation,

17  that identifies any new use of the assets that would reset the time for the tolling of the statute of

18  limitations."  2008 WL 4830740, at *6.  Indeed, the *Abbyy* court's holding rested on the fact that

19  plaintiff, a competitor of defendant's, had *benefited* from defendant's alleged post-merger

20  anticompetitive conduct.  Here, by contrast, Plaintiffs have alleged that FreeHand was used

21  differently pre- and post-merger, and that they have *suffered injury* as a result.

22      *Midwestern Machinery* is similarly unavailing to Adobe.  In that case, on *summary*

23  *judgment*, plaintiffs had shown no facts supporting their claim that Northwest's acquired assets

24  were used differently because plaintiffs provided no information about the pre-merger use.  Here,

25  by contrast, Plaintiffs have made the requisite allegations that FreeHand was used differently pre-

26  and post-merger, and will have the opportunity to produce sufficient facts in discovery to support

27  the "new use" exception if Adobe raises the statute of limitations defense again on summary

28  judgment.  Moreover, the Court disagrees that, as pled, Adobe's post-merger use of FreeHand was

22

1    the "unabated inertial consequence" of the merger itself.  Mot. 11 (quoting *Midwestern Mach.*, 392

2    F.3d at 271).  Taking the alleged facts in the light most favorable to Plaintiffs, Adobe did not

3    initially intend to discontinue its development of and support for FreeHand.  *See* FAC ¶ 69.  As

4    alleged in the FAC, Adobe's new use of FreeHand discussed above did not occur until at least May

5    16, 2007, when Adobe announced that it was changing course.  FAC ¶ 70.

6         The Court is also not persuaded by Adobe's policy argument that tolling the statute of

7    limitations on Plaintiffs' Clayton Act claim in this case will deter all mergers in the future.  Not all

8    mergers create monopolies with complete or nearly complete market power as alleged here.

9    Moreover, "[t]here are kinds of acts which would be lawful in the absence of monopoly but,

10   because of their tendency to foreclose competitors from access to markets or customers or some

11   other inherently anticompetitive tendency, are unlawful under [Section 2 of the Sherman Act] if

12   done by a monopolist." *City of Mishawaka*, 616 F.2d at 986.  Thus, finding Plaintiffs' Clayton Act

13   claim timely here will not necessarily lead to the result that all post-merger firms would

14   indefinitely face the specter of liability if they decided to raise prices or discontinue products after

15   merging.  Only those post-merger firms with monopoly power who use such tactics, along with

16   other anti-competitive conduct, to maintain their monopoly power would have anything to fear.  As

17   discussed in Sections V.A.1.a and V.C.1, where the continuing violation doctrine applies, post-

18   merger anticompetitive conduct by monopolists is already prohibited by Section 2 of the Sherman

19   Act.  Thus, Adobe's policy argument is a red herring.

20        In sum, it is not apparent from the face of the FAC that Plaintiffs can prove no set of facts

21   to avail themselves of the "new use" exception to the statute of limitations for their Section 7

22   Clayton Act claim.  Thus, the Court cannot dismiss this claim as time-barred.  Accordingly,

23   Adobe's motion as to this claim is DENIED.  Given that the viability of Plaintiffs' remaining state

24   law claims under California's UCL and the Washington's Consumer Protection Act is predicated

25   on the viability of Plaintiffs' federal antitrust claims, Adobe's motion as to these state law claims is

26   also DENIED.

27

28

Case No.: 11-CV-02174-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

United States District Court
For the Northern District of California

### 3.        Discovery Rule

The discovery rule "postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured." *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006). Adobe argues that Plaintiffs have not cited any Ninth Circuit cases applying the discovery rule to antitrust cases. Reply 2. The Court need not decide whether the discovery rule applies to Plaintiffs' claims because the Court finds that Plaintiffs' well-pled claims are not time-barred under the continuing violation doctrine and the "new use" exception.

### 4.        Fraudulent Concealment

Plaintiffs argue that the statutes of limitations on their claims are also tolled by the fraudulent concealment theory. Because the Court has already found that the statutes of limitations for Plaintiffs' well-pled claims are tolled by other doctrines, the Court need not reach this argument.

## VI.    Conclusion

For the foregoing reasons, the Court GRANTS Adobe's motion to dismiss with leave to amend as to Plaintiffs' Cartwright Act claim and DENIES Adobe's motion as to all other claims. If Plaintiffs wish to amend their complaint to address the deficiencies identified above, they must do so within 21 days.

**IT IS SO ORDERED.**


Dated: February 10, 2012                            *Lucy H. Koh*
                                                              _____
                                                              LUCY H. KOH
                                                              United States District Judge

24

Case No.: 11-CV-02174-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS